IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA for the
use of CUSTOM GRADING, INC.,
a New Mexico Corporation

        Use Plaintiff,

v.                                                                Case No. 12-CV-1313 WJ/KBM

GREAT AMERICAN INSURANCE COMPANY,
an Ohio Corporation, and MV INDUSTRIES, INC.,
a New Mexico Corporation,

        Defendants.

GREAT AMERICAN INSURANCE COMPANY

        Third-Party Plaintiff and Crossclaimant,

v.

MV INDUSTRIES,

        Crossclaim Defendant,

and

FLINCHUM CONSTRUCTION COMPANY, INC.,
MICHAEL VIGIL, and MELISSA
SELIGMAN-VIGIL,

        Third-Party Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART GREAT AMERICAN INSURANCE COMPANY'S MOTION TO DISMISS COUNTERCLAIMS BY MICHAEL VIGIL AND MELISSA SELIGMAN-VIGIL**

THIS MATTER comes before the Court on Third-Party Plaintiff Great American Insurance Company's Motion to Dismiss Counterclaims by Michael Vigil and Melissa Seligman-Vigil **(Doc. 18)**, filed April 29, 2013. For the reasons explained below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

1

## BACKGROUND

In or around May 2010, Defendant MV Industries, Inc. ("MVI") entered into a contract with Los Alamos National Security, LLC ("LANS") to act as general contractor on a federal public works project at the Los Alamos National Laboratory. The Miller Act, 40 U.S.C. §§ 3131-3134, requires that before a contractor can be awarded any contract of more than $100,000 for a federal public works project, it must furnish to the government a performance bond for the protection of the government, and a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person." 40 U.S.C. § 3131(b)(2). As the United States Supreme Court has explained,

> Ordinarily, a supplier of labor or materials on a private construction project can secure a mechanic's lien against the improved property under state law. But a lien cannot attach to Government property, so suppliers on government projects are deprived of their usual security interest. The Miller Act was intended to provide an alternative remedy to protect the rights of these suppliers.

*F.D. Rich Co. v. United States for use of Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974) (citations omitted). Accordingly, Third-Party Plaintiff Great American Insurance Company ("GAIC"), as surety, issued payment and performance bonds for the project on behalf of MVI, as principal, and in favor of LANS, as obligee.

In consideration for GAIC's issuing the bonds, MVI, Flinchum Construction Company, Inc. ("Flinchum"), Michael Vigil, and Melissa Seligman-Vigil ("the Vigils") each executed an Indemnity Agreement in favor of GAIC.[1] Under this agreement, MVI agreed to indemnify GAIC for any losses, costs, or expenses incurred with regard to the payment bond, including payments against the bond. The Indemnity Agreement also granted GAIC the right to investigate any claims against the bonds; to gain access to MVI's books, records, and accounts;

---

[1] Michael Vigil is the president of MVI, and Flinchum Construction is located at the same address as MVI.

and to require MVI to pay collateral as soon as liability existed or was asserted against GAIC, regardless of whether GAIC had actually made any payment.

Custom Grading, Inc. ("CGI"), a subcontractor on the project, has filed suit against MVI and GAIC under the Miller Act, alleging that MVI has failed to pay CGI for its labor and materials (Doc. 1). CGI seeks judgment against MVI for the amount owed and for unjust enrichment, and against GAIC for payment from the judgment bond. In response, GAIC has filed third-party claims against MVI, Flinchum, and the Vigils, alleging that they failed to fulfill their obligations as indemnitors, and bringing claims for breach of express contract and injunctive relief – specific performance against all indemnitors, and common law indemnification against MVI (Doc. 4).

In turn, the Vigils have brought counterclaims against GAIC for breach of implied covenant of good faith and fair dealing; violation of New Mexico's Unfair Insurance Practices Act; violation of the New Mexico Unfair Practices Act; tortious interference with existing contractual relations; and prima facie tort. GAIC now asks this Court to dismiss each of the Vigils' counterclaims.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual allegations which, if true, "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In reviewing a motion to dismiss, the Court accepts all well-pleaded factual allegations in the complaint as true and then determines whether the complaint plausibly states a legal claim

for relief.  *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

## DISCUSSION

The Vigils allege that GAIC improperly interfered with their relationship with the subcontractors on the federal project.  They argue that pursuant to a "paid upon payment" provision in the subcontracts, the subcontractors were entitled to payment for their work only after the Vigils received payment from LANS, and that the subcontractors also agreed that any disputes arising from the subcontracts would be resolved through arbitration.  However, according to the Vigils, GAIC proceeded to interfere with this arrangement by communicating directly with the subcontractors, instructing them not to communicate with MVI, and promising payment to resolve claims without resorting to the arbitration agreements.  By doing so, the Vigils allege, GAIC unreasonably interfered with MVI's ongoing discussions with subcontractors to resolve claim and payment issues, because as a result the subcontractors ceased further discussions with MVI.  The Vigils also assert that GAIC accrued unnecessary fees in the process of communicating with the subcontractors, for which it improperly claims indemnity.

Conversely, GAIC argues that it took action only because several of the subcontractors made claims on the payment bond due to MVI's failure to pay them.  Pursuant to the Indemnity Agreement, GAIC proceeded to investigate the subcontractors' claims, but despite repeated requests, MVI has not provided the information necessary to do so fully, nor has MVI paid collateral when requested to do.

I.       **Count I - Breach of Implied Covenant of Good Faith and Fair Dealing**

In their first claim, the Vigils assert that GAIC's communications with the subcontractors breached the covenant of good faith and fair dealing implied in the Indemnity Agreement. GAIC argues that the Vigils have failed to state a claim as a matter of law. The Court agrees to the extent that the Vigils bring a claim sounding in tort, but disagrees to the extent that the Vigils bring a claim sounding in contract.

A.       **Claim Sounding in Contract**

The New Mexico Supreme Court has held that "[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement," *Watson Truck & Supply Co., Inc. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990), and has recognized a cause of action for breach of this duty sounding in contract. *See Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 439, 872 P.2d 852, 857 (1994) (recognizing the covenant of good faith and fair dealing in employment contracts that are not at-will arrangements). As that court has explained,

> Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. . . . [One party]'s intentional use of the contract to the detriment of another party is wrongful, constitutes bad faith, and clearly is a breach of the covenant of good faith and fair dealing.

*Watson Truck & Supply Co., Inc. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990) (internal quotation marks and citation omitted).

Here, the Vigils allege that GAIC intentionally used the "right to settle" provision of the Indemnity Agreement to their detriment, by improperly investigating the subcontractors' claims and preventing the Vigils from being able to resolve those claims as intended. The Court finds that this properly alleges a breach of the covenant of good faith and fair dealing sounding in contract.

5

GAIC argues that the Vigils' claim fails because "there is no plausible set of circumstances in the counterclaims under which the [Vigils] could allege breach of the [Indemnity Agreement] by GAIC." Doc. 18 at 10. Specifically, it contends that (1) under the Indemnity Agreement, it has the right to investigate and pay bond claims, and broad discretion in how it does so; (2) "it is undisputed that MVI has not performed under the GAI," Doc. 18 at 10; and (3) the Indemnity Agreement gives it the right to demand collateral and request other information from the Vigils, but the Vigils have not complied with these demands. However, GAIC's right to investigate and pay bond claims does not give it the right to do so in bad faith or to direct the subcontractors to disregard their agreement to submit unpaid claims to arbitration, which is what the Vigils allege. The Vigils also argue that they have not yet paid subcontractors because MVI and the subcontractors have a "paid upon payment" agreement and LANS stopped paying MVI in June 2012. Further, they contend that the subcontractors had agreed to arbitrate their payment claims, but have failed to do so due to GAIC's interference. Finally, the Vigils argue that they have complied with all GAIC's requests for information. At this stage, the Court is not concerned with whether sufficient evidence underlies the Vigils' claims, only with whether, accepting all well-pleaded factual allegations as true, they have alleged a claim that is plausible on its face. The Court finds that they have done so.

### B.     Claim Sounding in Tort

However, the Court finds that to the extent that the Vigils ground their claim for breach of the covenant of good faith and fair dealing in tort, their claim must fail. The New Mexico Supreme Court has concluded that tort recovery for breach of the covenant of good faith and fair dealing is available only where a special relationship exists, such as between an insurer and insured. *Bourgeous*, 117 N.M. at 439, 872 P.2d at 857; *see also Heimann v. Kinder-Morgan*

*CO2 Co.*, 140 N.M. 552, 558, 144 P.3d 111, 117 (Ct. App. 2006) ("The breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists."); *City of Raton v. Arkansas River Power Auth.*, 611 F. Supp. 2d 1190, 1210 (D.N.M. 2008) ("New Mexico and Colorado do not allow a cause of action in tort for breach of the covenant of good faith except in insurance contracts, or possibly contracts that are adhesive in nature."). New Mexico courts do not appear to have addressed whether, in the context of a construction bond, a principal may bring a tort claim against its surety for a breach of the covenant of good faith and fair dealing. Thus, this Court must endeavor to predict how New Mexico courts would rule, and may be guided by "the policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts." *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574-75 (10th Cir. 1984).

  This Court finds persuasive the reasoning of courts holding that the relationship between a surety and a principal is not analogous to the relationship between an insurer and insured, and therefore that the tort of breach of good faith is unavailable to a principal. The relationship between a surety and the obligee is "'nearly identical'" to the relationship between an insurer and insured, because "'[w]hen an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation.'" *Shannon R. Ginn Const. Co. v. Reliance Ins. Co.*, 51 F. Supp.2d 1347, 1352 (S.D. Fla. 1999) (quoting *Transamerica Premier Ins. Co. v. Brighton Sch. Dist.*, 940 P.2d 348, 352 (Colo. 1997)). Thus, the obligee "looks to the surety for protection from calamity," *id.*, and accordingly, a number of courts have allowed obligees to sue sureties in tort for breach of bad faith. *See, e.g.*, *Bd. of Directors of Ass'n of Apartment Owners of Discovery Bay Condo. v.*

*United Pac. Ins. Co.*, 884 P.2d 1134, 1137 (Haw. 1994); *Dodge v. Fidelity and Deposit Co. of Maryland*, 778 P.2d 1240, 1242-43 (Ariz. 1989) ("We hold that a surety has a duty to act in good faith in responding to its obligee's claims . . . . Breach of this duty entitles the obligee to maintain a tort action and recover tort damages.").

In contrast, the relationship between the principal and surety differs: "the principal does not look to the surety for protection. Quite the opposite is true; the surety looks to the principal for indemnification." *Shannon R. Ginn Const. Co*., 51 F. Supp.2d at 1352 (citing *Airlines Reporting Corp. v. United States Fidelity and Guar. Co.*, 31 Cal.App.4th 1458, 37 Cal.Rptr.2d 563, 567 (1995) ("[I]t is a third party (the obligee), not the principal, who is protected, although the principal pays the premium.") and *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985) (both the principal and surety are liable to the obligee)); *see Schmitt v. Insurance Co. of North America*, 230 Cal.App.3d 245, 281 Cal.Rptr. 261, 269 (1991) ("[I]t is not the duty of the surety to protect the principal as if the principal were the insured under an insurance policy. The surety's duty runs to the third party obligee."). In the absence of a special relationship analogous to that between an insurer and insured, courts have held that the principal may not bring a tort claim against the surety for breach of bad faith, but is limited to the terms of the contract. *See Travelers Cas. & Sur. Co. of Amer. v. Amoroso*, C 03-5746 PJH, 2004 WL 1918890 (N.D. Cal. Aug. 24, 2004) ("[T]he tort of bad faith breach of implied covenant does not exist against a surety under California law and policy." (citing *Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 43-61, 980 P.2d 407 (1999)); *Masterclean, Inc. v. Star Ins. Co.*, 556 S.E.2d 371, 376-77 (S.C. 2001) (holding that a principal cannot sue a surety for a bad faith refusal to pay a first party claim). This Court agrees.

Accordingly, GAIC's motion to dismiss the Vigils' counterclaim for breach of the covenant of good faith and fair dealing is granted as to any claim sounding in tort, but denied as to any claim sounding in contract.

## II.     Count II – Violation of the New Mexico Unfair Insurance Practices Act

In their second claim, the Vigils allege that GAIC is an insurer governed by the New Mexico Insurance Code, NMSA 1978, Chapter 59A, and as such has violated the Unfair Insurance Practices Act ("UIPA") by misrepresenting pertinent facts or policy provisions and failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under the payment bond.[2]

The UIPA "shall apply as to insurers . . . and all other persons engaged in any business which is now or hereafter subject to the superintendent's supervision under the Insurance Code." NMSA 1978 § 59A-16-1.  It defines "insurer" as "every person engaged as principal and as indemnitor, surety or contractor in the business of entering into contracts of insurance," NMSA 1978 § 59A-1-8.  It defines "insurance" as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies, or to act as surety."  NMSA 1978 § 59A-1-5.  "'Surety' insurance includes . . . insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings and contracts of suretyship."  NMSA 1978 § 59A-7-8.

The Vigils point to the definitions of insurer and insurance to argue that GAIC, as a surety, is subject to the UIPA.  However, they provide no New Mexico (or other) authority applying the UIPA to the contract between a surety and its principal.  The Court again finds

---

[2] Although the Vigils do not cite to the specific section of the UIPA, the claims appear to allege violations of NMSA § 59A-16-3, engaging in an unfair or deceptive act or practice, as defined in NMSA § 59A-16-20.

9

persuasive the case law from other jurisdictions, cited above, holding that the relationship between a principal and surety in the context of a construction bond does not constitute insurance. As the South Carolina Supreme Court has explained,

> A surety bond, unlike insurance, is used to obtain a commercial advantage. "The principal does not seek protection from the surety against calamity . . . the principal seeks the commercial advantage of obtaining a contract with the obligee, which requires a payment or performance bond." . . . It cannot be said a principal is the true intended beneficiary of the bond.

*Masterclean, Inc.*, 556 S.E.2d at 375-77 (quoting Bernard L. Balkin & Keith Witten, *Current Developments in Bad Faith Litigation Involving the Performance and Payment Bond Surety*, 28 Tort & Ins. L.J. 611, 624 (1993)). Such is the case here: GAIC did not insure the Vigils against calamity, but enabled them to engage in a commercial transaction. New Mexico's statutory definitions do not compel a different conclusion. The definition of surety insurance addresses the relationship between a surety and the obligee, which the surety has agreed to insure against calamity, by guaranteeing the principal's performance and guaranteeing and executing bonds to protect the obligee from any consequences of the principal's default. Additionally, under the definitions of insurer and insurance, the Vigils insured GAIC by agreeing to indemnify it for all losses, rather than the other way around. Moreover, to determine whether a contract falls under the UIPA, New Mexico courts look to the purpose of the contract rather than to the label it carries. *See Guest v. Allstate Ins. Co.*, 2010-NMSC-047, 149 N.M. 74, 87, 244 P.3d 342, 355 ("[T]he current definition [of insurance], adopted by the Legislature as part of the Insurance Code in 1984, articulates a functional approach, looking to the substance of the contract rather than to its label.").

Accordingly, GAIC's motion to dismiss the Vigils' UIPA claim is granted.

**III.    Count III – Violation of the New Mexico Unfair Practices Act**

In their third claim, the Vigils allege that GAIC, as a company doing business in New Mexico, is subject to the New Mexico Unfair Practices Act ("UPA"), NMSA 1978 §§ 57-12-1 through -26, which it violated by "failing to deliver the quality of services contracted for, in particular failing and refusing to act as a reasonable surety by interfering with the claims resolution process prematurely and encumbering MV Industries' ability to discuss claims with its subcontractors." Doc. 14 at 10.

The UPA provides a private right of action for "[a]ny person who suffers any loss of money or property" as a result of an unfair trade practice. NMSA 1978 § 57-12-10(B). An "unfair or deceptive trade practice" is defined as "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person." *Id.* at § 57-12-2(D). A claim under the UPA must allege four elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 749 F. Supp. 2d 1235, 1259 (D.N.M. 2010) (quoting *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991)). "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. at 100-01, 811 P.2d at 1311-12.

11

The Court finds that the Vigils have not alleged that GAIC made any false or misleading statement, nor that it made such a statement knowingly. The Vigils have alleged only that GAIC failed "to deliver the quality of services contracted for, in particular failing and refusing to act as a reasonable surety." Doc. 14, ¶ 45, at 14. Although failure to deliver the quality of services contracted for constitutes an unfair trade practice, NMSA 1978 § 57-12-2(D)(17), alleging this failure does not in itself allege a knowingly-made false or misleading statement. *See Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100-01, 811 P.2d 1308, 1311-12 (1991) (trial court erred in instructing jury to find party liable under the UPA for "fail[ing] to deliver the quantity of goods contracted for" alone, without also requiring jury to find that the party had knowingly made any false or misleading statement of any kind in connection with the transaction). Further, the Court notes that the UPA does not appear to have been enacted to protect sophisticated parties from conflicts in commercial dealings, but to protect consumers. *See Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 22, 142 N.M. 437, 442, 166 P.3d 1091, 1096 ("Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising. At a minimum, the focus on advertising suggests that the UPA addresses representations directed at the public at large, as consumers.").

Accordingly, GAIC's motion to dismiss the Vigils' UPA claim is granted.

**IV.   Counts IV and V – Tortious Interference with Existing Contractual Relations and Prima Facie Tort**

In their fourth claim, the Vigils allege that GAIC committed tortious interference with existing contractual relations, by instructing MVI's subcontractors no longer to communicate with MVI and by promising to pay the subcontractors' claims without resorting to the arbitration requirements. Finally, in their fifth claim, the Vigils allege that GAIC committed prima facie tort by making misrepresentations to Mrs. Seligman-Vigil, with the intent of coercing payment

12

under the Indemnity Agreement.  GAIC contends that both of these claims must be dismissed pursuant to the economic loss rule, which precludes recovery in tort for purely economic losses.

New Mexico law holds that "[a]s a matter of policy, the parties [to a contract] should not be allowed to use tort law to alter or avoid the bargain struck in the contract.  The law of contract provides an adequate remedy." *In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. 542, 893 P.2d 438, 446 (1995).  Accordingly, New Mexico law adheres to the economic-loss doctrine, which holds that "a plaintiff may not recover in tort for losses that are purely economic, i.e. not involving personal injury or property damage." *Farmers Alliance Mut. Ins. Co. v. Naylor*, 452 F. Supp.2d 1167, 1171-72 (D.N.M. 2006) (citing *Utah Int'l Inc. v. Caterpillar Tractor Co.*, 108 N.M. 539, 542, 775 P.2d 741, 744 (1989)).  This doctrine prevents plaintiffs "from recovering in tort economic losses to which their entitlement flows only from a contract," *id.*, and applies only "in commercial transactions, when there is no great disparity in bargaining power of the parties." *Utah Int'l Inc.*, 108 N.M. at 542, 775 P.2d at 744.

However, another court in this district has persuasively concluded that New Mexico's economic loss rule "does not bar tort claims arising from an independent duty of care." *Farmers Alliance Mut. Ins. Co. v. Naylor*, 452 F. Supp.2d 1167, 1173 (D.N.M. 2006) (interpreting New Mexico's economic loss doctrine); *see also Bull v. BKG Holdings, LLC*, 859 F. Supp.2d 1238, 1243 (D.N.M. 2012) (Johnson, J., agreeing with *Naylor*).  Under New Mexico law, the "difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Kreischer v. Armijo*, 118 N.M. 671, 673, 884 P.2d 827, 829 (Ct. App. 1994).

The Court finds that the Vigils have not alleged a great disparity in bargaining power between the parties in the instant case.  Therefore, the Vigils' counterclaim fails to state a claim

13

for tortious interference with existing contractual relations and prima facie tort. In their response, the Vigils argue only that "there is no allegation of equal sophistication on the part of the indemnitors who are part of the [Indemnity Agreement]" and that therefore the Vigils adequately pled their tort claims.[3] However, it is their responsibility to offer sufficient factual allegations to state a facially plausible claim for relief; it is not the Court's responsibility to presume those allegations are present unless GAIC proves otherwise.

The Court also finds that the economic losses that Vigils allege[4] derive from the contract at issue and not from violations of independent duties. Although the Vigils argue that their contracts with the subcontractors are "independent contracts not specifically related to the payment bond," Doc. 22 at 15, the terms of the payment bond require GAIC to pay the subcontractors should MVI fail to do so without justification, and the Indemnity Agreement gives GAIC the right to investigate claims by the subcontractors. Therefore, GAIC's communications with the subcontractors, to which the Vigils object, arise directly from the terms of the contracts underlying this suit.[5] Similarly, the facts underlying the Vigils' prima facie tort claim cannot be separated from the contractual conflicts at issue here. The Vigils allege that Bryan Sawyer, GAIC's agent, spoke in an insulting, condescending and insulting manner to Mrs. Seligman-Vigil, by referring to Mr. Vigil as "psycho" and erroneously stating that he (Sawyer) knew that the Vigils were divorcing. Doc. 22 at 16. However, the Counterclaim alleges that

---

[3] The Court notes that the Vigils do not claim that such a disparity in sophistication exists, only that GAIC has not alleged that it does not.

[4] The Vigils' counterclaim asks only for "damages" and does not expressly allege personal injury or property damages. In its motion, GAIC states that "there is no question that the Counterclaimants are only seeking economic damage, and they do not allege any personal injury or property damages." Doc. 18, ¶ 54, at 14. The Vigils do not object to this statement in their response, and the Court finds that they have conceded it.

[5] It also seems illogical for the Vigils to argue that, on the one hand, GAIC's communications with the subcontractors breached the contract's implied covenant of good fair dealing, and then contend that, on the other hand, the same communications are entirely independent of the contract.

these misrepresentations were made to coerce payment under the Indemnity Agreement. Any economic damages alleged to have arisen from this encounter arise from that contract.

Accordingly, GAIC's motion to dismiss the Vigils' claims for tortious interference with contractual relations and prima facie tort is granted.

### V.     Leave to Amend Counterclaim

Finally, the Vigils request that should this Court find any of their claims to be insufficient to survive GAIC's motion, the Court grant them leave to amend their counterclaim. Rule 15(a) of the Federal Rules of Civil Procedure provides that, once a responsive pleading has been served, a party may amend its pleading "only with the opposing party's written consent or the court's leave." The Rule instructs the Court to "freely give leave when justice so requires," *id.*, and a court should "generally refuse leave to amend only on a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Duncan v. Manager, Dep't of Safety, City and Cnty. of Denver*, 397 F. 3d 1300, 1315 (10th Cir. 2005).

The Vigils' request to amend their counterclaim is premature at this stage, as there is no indication in the record that the Vigils' attorney has drafted an amended counterclaim or submitted such a proposed amended counterclaim to opposing counsel to determine whether a motion to amend would be opposed. Consequently, the Court denies the Vigils' request for leave to amend their counterclaim, although such denial is without prejudice to the Vigils filing a motion to amend in compliance with the Federal Rules of Civil Procedure and the Local Rules of this Court.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant's Motion to Dismiss Counterclaims by Michael Vigil and Melissa Seligman-Vigil (**Doc. 18**) as to Count I for breach of the implied covenant of good faith and fair dealing sounding in tort; Count II for violation of the UIPA; Count III for violation of the UPA; Count IV for tortious interference with contractual relations; and Count V for prima facie tort. The Court **DENIES** the motion as to Count I for breach of the implied covenant of good faith and fair dealing sounding in contract.

Finally, the Court hereby **DENIES WITHOUT PREJUDICE** the Vigils' request for leave to amend their counterclaim.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE